## Case No. 1,470.

### BLACKINTON v. DOUGLASS.

[1 MacA. Pat. Cas. 622.]

Circuit Court, District of Columbia. April Term, 1859.

PATENTS—INTERFERENCE — APPEAL FROM COMMISSIONER—ASSIGNMENT OF REASONS — LIMITATION OF TIME TO APPEAL—"PUBLIC USE."

[1. That a decision rejecting an application for a patent is against evidence and the weight of evidence is too vague and indefinite to be considered a substantive reason of appeal specifically set forth within Act 1839, § 11.]

[2. An assignment of a reason is not specific which does not point out the precise matter of alleged error with such reasonable certainty as to satisfy an intelligent mind.]

[3. The court may assume that the commissioner has enlarged the time of appeal where the appeal in other respects is regular and the

reason of appeal is filed shortly after the expiration of the time limited for such filing.]

[4. On interference, the application for the patent was properly denied where it appeared that the applicant had permitted the making and public use of articles involving his invention by a number of persons without restriction for more than two years before his application, and had also exhibited and sold the articles.]

[5. "Public use" for more than two years, such as will defeat an application for a patent made after such period, means use in public, and not use by the public.]

[Appeal from the commissioner in patents.

[On interference. William Blackinton, assignee of Benjamin F. Horn, applicant, against Alexander Douglass, grantee of letters patent No. 17,082, of April 21, 1857, antedated January 26, 1857.]

MERRICK, Circuit Judge. In giving my opinion, it is unnecessary to describe the improvement in ladies' dresses which is the subject-matter of controversy, as the applicant does not, in his reasons of appeal, deny that an interference was properly declared, and thereby he admits the substantial identity of his invention with that of Alexander Douglass, patented on the 21st of April and antedated to 26th of January, 1857 (No. 17,082). The reasons of appeal, according to the most indulgent construction, are only two: First, That the applicant Horn was the first inventor. Secondly, That he did not in any manner abandon his right to a patent before his application. That which is apparently assigned as a third reason, to wit, that the decision rejecting his application is against evidence and the weight of evidence, is entirely too vague and indefinite to be considered within the provisions of the eleventh section of the act of 1839, as a substantive reason of appeal, "specifically set forth in writing." It can only be regarded as explanatory of each of the two previously-assigned errors, and as declaring that on the question of priority and the question of abandonment the evidence alike sustains the pretensions of the appellant. While it was not the purpose of the patent laws to introduce into the practice of appeals the nice refinements and technicalities of special pleading, the emphatic language of the statute is not destitute of significance, and, according to the spirit of the act, no assignment can be sufficiently specific which does not, with that reasonable certainty which would satisfy an intelligent mind, point out the precise matter of alleged error; and if for no other object, manifestly in order that the office, in response to the assignments of error, may present definite suggestions thereon for the consideration of the judge on appeal, and if need be, upon a clear error being pointed out, itself correct that error without the vexation of an appeal. But whatever was the motive of the legislature, the requirement of law has been made,

and must be respected by appellants at the peril of losing all benefit by appealing. The laxity in practice of appellants has been the subject of repeated comment by the several judges of the circuit court, and gave occasion to an official letter from the late Chief Justice Cranch to Commissioner Ewbank, dated June 11th, 1850, in which he requested that in all cases parties taking appeals should be notified that the revision of the judge would be confined to "the reasons of appeal, specifically set forth in writing and filed in the office, and to the grounds of the commissioner's decision, fully set forth in writing, touching all the points involved in the reasons of appeal."

My attention has been directed to this question in the present case by the response of the office itself, and also by the argument filed by the counsel for Douglass on motion to dismiss the appeal for want of specific reasons of appeal. But as two of the reasons of appeal may by liberal construction be taken to present specific questions for revision, the motion on that ground cannot prevail. The appellee has also moved to dismiss the appeal upon the ground that the decision of the office of December 10th, 1858, limited the time for appealing to thirty days, and that the appeal was not filed until the 11th of January, 1859. It is perhaps not necessary now to decide what would be the effect of disregarding such a limitation if insisted upon by the office. As this appeal was probably mailed at Boston within the time required by the office, and having been received and filed by the office on the 11th January—only the second day after the limit—and having been certified to me as a subsisting appeal, I feel authorized to presume, from the acts of the office, that in the exercise of a wise and proper discretion the limit of appeal was enlarged. Before, however, passing to the main point of the case, it is proper to notice the argument which has been transmitted through the mail to me by the counsel of the appellant. In that argument he has commented in a most unwarrantable manner upon the report and motives of the examiner in charge of the case; and I cannot suffer such conduct on the part of a solicitor to pass without rebuke. No one has a right to assail the motives or integrity of a public officer acting upon his responsibility to his fellow-citizens, and under the solemn sanction of his oath of office, without some weightier occasion for the charge that a supposed illogical course of reasoning or the announcement of a legal conclusion, which to the mind of the assailant seems utterly untenable. The supreme court of the United States, in the case of Boyden v. Burke, 14 How. [55 U. S.] 583, has said that "those to whom the people have committed high trusts are entitled at least to common courtesy, and are not bound to submit to the insolence or ill temper of those who disregard the decencies of social

intercourse." This remark of that high tribunal applies with especial force to the employment of offensive words in a carefully-written argument, and, considered in connection with the facts of this case, warrants me in the determination to which I have come—not to place on the files of the office, together with the other papers in the cause, this paper containing language unnecessarily discourteous and offensive.

The two points made by the office and presented in the reasons of appeal were as to the invention of Horn in 1854 or 1855, and his abandonment of the invention, by suffering it to be used in public for more than two years before his application. That the invention existed in 1854 and 1855, is very clear, from the testimony of Mrs. Adelie H. Newton and Mrs. M. A. Tibbets; and if it was in public use for more than two years before Horn's application, with his knowledge and consent, it is not material whether he was the inventor or not, as in either alternative he would not be entitled to a patent. Mrs. Newton, according to her own testimony, made in the year 1854, under instructions from Horn's wife, and thenceforth continually, wore a bustle such as is described in the specification. Mrs. Tibbets testifies that Mrs. Horn was publicly wearing such a bustle when she and her husband were on a visit to Mrs. Tibbets at Dover, New Hampshire, in August, 1855, and that under the direction of Mrs. Horn she made a similar article, and wore them always from that time forth; this, too, was with the knowledge and consent of Horn. Besides the continued use of the article by Mrs. Horn and these two friends in public from 1854 and 1855, the testimony shows that the article was known to and worn without restriction by others, to whom Mrs. Horn communicated it; and through all this period of four years the testimony discloses no effort on the part of Horn to conceal from others the knowledge of the invention, nor to restrict in any manner its use by those to whom the knowledge of it was imparted, nor any assertion of exclusive right or declaration of purpose to apply for a patent; and this was followed up by an open exhibition and sale of the article in his store in the winter of 1856 and 1857, and then, according to his own declaration, its being thrown aside, and the sale abandoned, because he found the article did not succeed and he had found something better. Without attaching any weight to Horn's admission to the witnesses Smith and Leland that he had been selling these skirts from his store for several years, the above-mentioned testimony establishes beyond controversy that the article, whatever it was and by whomsoever invented, had been used in public with the knowledge and consent of Horn more than two years before his application. It is therefore quite immaterial that we should scan the testimony to determine whether Horn himself was the true and first inventor of the improvement in question.

But the counsel for the applicant seeks to evade the force of the testimony as to the use of the article by these several persons in public, by relying upon what Judge Story is supposed to have said—"that the use of the invention by a few persons as an act of personal accommodation or neighborly kindness will not vitiate an application." But Judge Story, in the case of Wyeth v. Stone [Case No. 18,107], is far from saying what is attributed to him by the counsel in this case and so often by others. The language of the judge is this: "To defeat his right to a patent under such circumstances it is essential that there should have been a public use of his machine, substantially as it was patented with his consent. If it was merely used occasionally by himself in trying experiments, or if he allowed only a temporary use thereof by a few persons as an act of personal accommodation or neighborly kindness for a short and limited period, that would not take away his right to a patent. To produce such an effect, the public use must be either generally allowed or acquiesced in, or at least be unlimited in time, extent, or object." There is nothing in the language of the judge in that case which countenances the idea that a use in public of an invention which is unlimited in time, extent, or object, which is not temporary, and for a short and limited period, will not defeat a patent, whatever the motive of the inventor in granting such unlimited indulgence to two or three friends. The rule, on the other hand, is correctly laid down in Curtis on Patents (section 53) that "the phrase 'public use' means use in public, and not use by the public; so that under the act, if there had been a use in public by any person, (for more than two years), with the consent or allowance of the patentee, the patent will be defeated." So, also, in section 297: "By 'public use' is meant use in public; that is to say, if the inventor himself makes and sells the thing to be used by others, or it is made by one other person only, with his knowledge and without objection, before his application for a patent; a fortiori, if he suffers it to get into general use, it will have been in public use." The supreme court, in Shaw v. Cooper, 7 Pet. [32 U. S.] 321, 322, remark that "a strict construction of the act, as it regards the public use of an invention before it is patented, is not only required by its letter and spirit, but also by sound policy. A term of fourteen years was deemed sufficient for the enjoyment of an exclusive right of an invention by the inventor; but if he may delay an application for his patent at pleasure, although his invention be carried into public use, he may extend the period beyond what the law intended to give him. A pretense of fraud would afford no adequate security to the public in this respect, as artifice

might be used to cover the transaction. The doctrine of presumed acquiescence, when the public use is known or might be known to the inventor, is the only safe rule which can be adopted on this subject." If so stern a rule were wise and just prior to the passage of the seventh section of the act of 1839, surely he is without excuse who transcends the indulgence of two years accorded by that law. This view of the law of the case relieves me of the necessity of considering the competency of Horn as a witness, and also of analyzing his testimony and weighing its credibility. Independently of his testimony and that of his impugners, Leland and Smith, there is enough in the case upon the applicant's own showing to reject his application, because he suffered his invention to pass into public use for more than two years before his application.

Now, therefore, I certify to the Hon. S. T. Shugert, commissioner of patents, that, after due notice to the parties, I have read and considered the papers, proceedings, testimony, and arguments of counsel in the above-entitled cause, and I am of opinion that the decision of the office rejecting the application of William Blackinton, assignee of Benjamin F. Horn, was correct; that the same is accordingly affirmed, and a patent to said applicant must be refused.